No. 18-2385

In the United States Court of Appeals
for the Seventh Circuit

———————————————————

LARRY E. HATFIELD,

Plaintiff-Appellee,

v.

JEFFERSON B. SESSIONS, III, Attorney General of the United States,

Defendant-Appellant.

———————————————————

Appeal from a Judgment of the United States District Court
for the Southern District of Illinois
The Hon. J. Phil Gilbert, District Judge
(Dist. Ct. No. 3:16-cv-00383-JPG-RJD)

————————————————

BRIEF OF AMICUS CURIAE
SECOND AMENDMENT FOUNDATION, INC.
IN SUPPORT OF APPELLEE URGING AFFIRMANCE

————————————————

Alan Gura
GURA PLLC
916 Prince Street, Suite 107
Alexandria, VA 22314
703.835.9085
alan@gurapllc.com

October 12, 2018          Counsel for Amicus Curiae

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-2385

Short Caption: Larry E. Hatfield v. Jefferson B. Sessions, III, Attorney General of the United States

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[ ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Second Amendment Foundation, Inc.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Gura PLLC

(3)    If the party or amicus is a corporation:

    i)    Identify all its parent corporations, if any; and

        None

    ii)    list any publicly held company that owns 10% or more of the party's or amicus' stock:

        None

Attorney's Signature: s/ Alan Gura    Date: October 9, 2018

Attorney's Printed Name: Alan Gura

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes  X    No _____

Address:    916 Prince Street, Suite 107

        Alexandria, VA 22314

Phone Number:  703.835.9085    Fax Number:  703.997.7665

E-Mail Address:  alan@gurapllc.com

rev. 01/15 GA

TABLE OF CONTENTS

Table of Contents.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

Interest of Amicus Curiae. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Introduction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

Summary of Argument.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

Argument.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

     I.    The Right to Arms Belongs to Law-Abiding, Responsible
           Individuals. Only Dangerousness—a Heightened Risk
           that an Individual Would Pose if Armed—Justifies
           Disarmament.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

     II.   "Virtuousness" Is Not a Second Amendment Standard. . . .  12

     III.  Felon Disarmament Laws Are Subject to Individualized
           As-Applied Challenges.. . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

           A.   Legislatures Cannot Define the Scope of a
                Constitutional Right.. . . . . . . . . . . . . . . . . . . . . . . . . . .  19

           B.   This Court Follows the Majority Rule Allowing
                Individualized As-Applied Challenges to Felon
                Disarmament Laws.. . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

IV.    Larry Hatfield Is Entitled to One-Step Relief Because
       He Is A Law-Abiding, Responsible Citizen Posing
       No Heightened Risk of Gun Violence. . . . . . . . . . . . . . . . . 27

V.     While Policy Considerations Cannot Override Fundamental
       Rights, Failure to Acknowledge Individualized Relief from
       Felon Disarmament Laws Would Have Absurd and
       Dangerous Results. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

TABLE OF AUTHORITIES

Cases

*Baginski* v. *Lynch*,
    229 F. Supp. 3d 48 (D.D.C. 2017) . . . . . . . . . . . . . . . . . . . . . . . . 12

*Begay* v. *United States*,
    553 U.S. 137 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Binderup* v. *Atty. General*,
    836 F.3d 336 (3d Cir. 2016) (en banc) . . . . . . . . . . . . . . . . . passim

*Board of Trs. of State Univ. of N.Y.* v. *Fox*,
    492 U.S. 469 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Borden's Farm Products Co.* v. *Baldwin*,
    293 U.S. 194 (1934). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Britt* v. *State*,
    363 N.C. 546, 681 S.E.2d 320 (N.C. 2009). . . . . . . . . . . . . . . . . . 31

*Cohens* v. *Virginia*,
    19 U.S. (6 Wheat.) 264 (1821). . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*District of Columbia* v. *Heller*,
    554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Ezell* v. *City of Chicago*,
    651 F.3d 684 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . 1, 30, 31

*Ezell* v. *City of Chicago*,
    846 F.3d 888 (7th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 30

*Fortson* v. *L.A. City Attorney's Office*,
    852 F.3d 1190 (9th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . 23, 24, 26

*Hamilton* v. *Pallozzi*,
848 F.3d 614 (4th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*HH-Indianapolis, LLC* v. *Consol. City of Indianapolis*,
889 F.3d 432 (7th Cir. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Holloway* v. *Sessions*, No. 1:17-CV-81,
2018 U.S. Dist. LEXIS 168996 (M.D. Pa. Sept. 28, 2018) . . . . . . 12

*In re United States*,
578 F.3d 1195 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*McDonald* v. *City of Chicago*,
561 U.S. 742 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Moore* v. *Madigan*,
702 F.3d 933 (7th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 9

*Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco,*
*Firearms & Explosives*, 700 F.3d 185 (5th Cir. 2012) . . . . . . . . 8, 11

*Obergefell* v. *Hodges*,
135 S. Ct. 2584 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Rummel* v. *Estelle*,
445 U.S. 263 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Schrader* v. *Holder*,
704 F.3d 980 (D.C. Cir. 2013). . . . . . . . . . . . . . . . . . . 5, 24, 31, 33

*Sessions* v. *Dimaya*,
138 S. Ct. 1204 (2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Suarez* v. *Holder*,
255 F. Supp. 3d 573 (M.D. Pa. 2015). . . . . . . . . . . . . . . . . . . . . . 32

*Turner* v. *Safley*,
 482 U.S. 78 (1987)................................... 18

*United States* v. *Bass*,
 404 U.S. 336 (1971)................................. 9

*United States* v. *Bogle*,
 717 F.3d 281 (2d Cir. 2013)........................ 26

*United States* v. *Carter*,
 752 F.3d 8 (1st Cir. 2014)......................... 25

*United States* v. *Chovan*,
 735 F.3d 1127 (9th Cir. 2013) .................. 20, 21

*United States* v. *Edge Broad. Co.*,
 509 U.S. 418 (1993)............................ 27, 28

*United States* v. *Marcavage*,
 609 F.3d 264 (3d Cir. 2010) ................... 19, 28

*United States* v. *McCane*,
 573 F.3d 1037 (10th Cir. 2009)..................... 24

*United States* v. *Phillips*,
 827 F.3d 1171 (9th Cir. 2016)................... 23, 26

*United States* v. *Rozier*,
 598 F.3d 768 (11th Cir. 2010) (per curiam) ........ 26

*United States* v. *Scroggins*,
 599 F.3d 433 (5th Cir. 2010)....................... 26

*United States* v. *Torres-Rosario*,
 658 F.3d 110 (1st Cir. 2011) .................. 18, 22

*United States* v. *Vongxay*,
  594 F.3d 1111 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States* v. *Williams*,
  616 F.3d 685 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . 21, 26, 31

*United States* v. *Woolsey*,
  759 F.3d 905 (8th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States* v. *Yancey*,
  621 F.3d 681 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . 9, 13, 14, 17

*Ward* v. *Rock Against Racism*,
  491 U.S. 781 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Wash. State Grange* v. *Wash. State Republican Party*,
  552 U.S. 442 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Wis. Right to Life, Inc.* v. *FEC*,
  546 U.S. 410 (2006) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Wrenn* v. *District of Columbia*,
  864 F.3d 650 (D.C. Cir. 2017) . . . . . . . . . . . . . . . . . . . . 7, 11, 29, 30

Constitutional Provisions

U.S. Const. amend. II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Statutes and Rules

18 Pa. C.S. § 6105(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

18 U.S.C. § 921(a)(20)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

18 U.S.C. § 922(g)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 925(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Fla. Stat. § 379.233. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Fla. Stat. § 403.161(1)(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Mass. Gen. Law c. 129, § 39. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Mass. Gen. Law c. 129, § 43. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Mass. Gen. Law c. 266, § 30A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

N.J. Stat. Ann. § 2C:39-7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Other Authorities

Adam Winkler, *Heller's Catch-22*,
  56 UCLA L. Rev. 1551 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Bernard Schwartz,
  *The Bill of Rights: A Documentary History*
  (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

C. Kevin Marshall, *Why Can't Martha Stewart
  Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y
  695 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Debates and Proceedings in the Convention of the
  Commonwealth of Massachusetts Held in
  the Year 1788* (Boston, William White 1856). . . . . . . . . . . . . . . . 11

Don B. Kates, Jr., *Handgun Prohibition and the
  Original Meaning of the Second Amendment*,
  82 Mich. L. Rev. 204 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Don B. Kates, Jr., *The Second Amendment: A Dialogue*,
  49 Law & Contemp. Probs. 143 (Winter 1986). . . . . . . . . . . . 14, 15

Erika Pesantes, *Love hurts: Man arrested for
  releasing helium balloon with his girlfriend*,
  Sun Sentinel, February 22, 2013, available at
  http://articles.sun-sentinel.com/2013-02-22/
  news/fl-helium-balloon-environmental-
  crime-20130222_1_helium-balloon-fhp-
  trooper-wood-storks (last visited Oct. 9, 2018). . . . . . . . . . . . . . . 35

Glenn Harlan Reynolds, *A Critical Guide to the Second  Amendment*,
  62 Tenn. L. Rev. 461(1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Megan Cassidy, *A visceral reaction with no time to spare:
  Arizona man gives emotional account of saving DPS
  trooper*, Arizona Republic, Jan. 24, 2017, available at
  http://www.azcentral.com/story/news/local/southwest-
  valley/2017/01/24/phoenix-man-gives-emotional-recount-
  taking- life-save-trooper/97005886/ (last visited Oct. 9, 2018). . . . 36

*Ohio woman faces $10K fine, 4 years' prison for 4 extra tires*,
  Atlanta Journal-Constitution, Sept. 27, 2018, available at
  https://www.ajc.com/news/national/ohio-woman-faces-10k-fine-
  years-prison-for-extra-tires/OU6DRSZvzAYgO9tPjWZK2J/
  (last visited Oct. 9, 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Saul Cornell, *"Don't Know Much About History":
  The Current Crisis in Second Amendment Scholarship*,
  29 N. Ky. L. Rev. 657 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

*State of Florida* v. *Anthony Cade Brasfield*,
    Broward County (Fl.) Case No.
    13002444CF10A (filed Feb. 18, 2013). . . . . . . . . . . . . . . . . . . . . . . 35

INTEREST OF AMICUS CURIAE[1]

Second Amendment Foundation, Inc. ("SAF") is a non-profit tax-exempt educational foundation, with over 650,000 members and supporters throughout the United States, dedicated to the preservation of Second Amendment rights. Through its legal action programs, SAF is a leading defender of the right to keep and bear arms. Among its achievements, SAF prevailed before the Supreme Court in *McDonald* v. *City of Chicago*, 561 U.S. 742 (2010), establishing that the Fourteenth Amendment applies the right to arms as against states and localities. SAF's victories have included *Ezell* v. *City of Chicago*, 846 F.3d 888 (7th Cir. 2017) ("*Ezell II*"); *Moore* v. *Madigan*, 702 F.3d 933 (7th Cir. 2012); and *Ezell* v. *City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ("*Ezell I*").

SAF regularly investigates and assists claims for individualized as-applied relief from felon disarmament laws, often by sponsoring litigation. This case will set precedent directly impacting the

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person, other than amicus curiae, its members or its counsel, contributed money that was intended to fund the preparation or submission of this brief.

fundamental rights of many individuals, including SAF members, who

may be eligible for as-applied relief from felon disarmament laws.

INTRODUCTION

Circuit precedent acknowledges the availability of as-applied relief

from Section 922(g)(1)'s so-called "felon in possession" ban.[2] The court

below correctly recognized that Larry Hatfield is entitled to such relief,

as his possession of firearms would pose no particular risk.

Yet the lower court's analysis—affording relief because there is no

connection between low-level white collar crimes and violence—is

misfocused. As-applied challenges such as Hatfield's are best resolved by

examining the challenger's individualized circumstances, of which the

predicate offense is but one important element. The lower court's

categorical approach contains the same flaw inherent in Defendant's

theory foreclosing the possibility of as-applied relief: it allows a

legislature to define the scope of a fundamental right.

Hatfield could have framed his challenge in categorical terms, seeking

relief because his offense is unrelated to dangerousness with firearms.

---

[2]All statutory references are to Title 18 of the United State Code
unless noted otherwise.

While that fact suffices to sustain Hatfield's judgment, his as-applied challenge was properly personalized. Even had Defendant conjured some link between paperwork offenses and gun violence, individuals so convicted are still entitled to prove that they are, today, law-abiding responsible citizens entitled to Second Amendment rights.

The lower court also erred in resolving this dispute via a two-step framework. Hatfield understandably stresses this approach, to which courts are almost magnetically attracted, as he should prevail under any level of scrutiny. But as this Court acknowledged, the two-step process has its limits. Demonstrating that the government lacks an interest in disarming a challenger resolves the dispute in the challenger's favor, leaving nothing to balance.

## SUMMARY OF ARGUMENT

Logic and precedent require the prospect of relief from categorical disarmament provisions. That is especially true of Section 922(g)(1). Unlike some state disarmament laws that focus on the nature of predicate offenses, *e.g.* violent or drug crimes, Section 922(g)(1) bars firearm possession on the basis of the predicate's potential sentence.

Since legislatures have a largely free hand in defining crimes and their sentencing ranges, rubber-stamping the permanent deprivation of a fundamental right on the basis of such legislative actions would essentially empower legislatures to define a fundamental right's scope. But rights are recognized by the Constitution.

Moreover, the Supreme Court has declared felon disarmament "presumptively lawful." *District of Columbia* v. *Heller*, 554 U.S. 570, 626-27 n.26 (2008). Generally, presumptions can be overcome. When a challenger shows that the conditions ordinarily justifying disarmament are absent, the presumption disappears. Felon disarmament laws lack direct Framing Era antecedents, but they relate to the ancient practice of disarming dangerous individuals. Dangerousness has always been and remains the touchstone for determining whether individuals may be barred from possessing arms.

Because this case asks whether Larry Hatfield, specifically, is so dangerous as to warrant disarmament, it does *not* raise an interest-balancing, two-step question. A facial challenge to Section 922(g)(1), or a categorical as-applied challenge to that provision, might well be resolved

4

by deciding whether disarming some category of people, as a general matter, is properly tailored to a public safety interest. But here, what happens generally is irrelevant. The question is whether *Hatfield* "has become a law-abiding, responsible citizen entitled to use arms in defense of hearth and home." *Schrader* v. *Holder*, 704 F.3d 980, 992 (D.C. Cir. 2013). If Hatfield defeats the presumption that he should be disarmed on account of dangerousness, disarming him cannot advance any government interest. There is nothing to balance, no second step, no means-ends scrutiny.

To be sure, Congress and the states may legislate broadly in this area. But the broader they legislate, the more care must be given to avoid denying law-abiding, responsible citizens the right to access arms for their defense. Ideally, legislatures would draft more careful laws, but courts cannot shirk their duty to safeguard fundamental rights. The failure to recognize claims for individualized as-applied relief would also lead to absurd and dangerous results.

ARGUMENT

I.  THE RIGHT TO ARMS BELONGS TO LAW-ABIDING, RESPONSIBLE
    INDIVIDUALS. ONLY DANGEROUSNESS—A HEIGHTENED RISK THAT AN
    INDIVIDUAL WOULD POSE IF ARMED—JUSTIFIES DISARMAMENT.

The Second Amendment provides that the right to keep and bear

arms is a "right of the People." U.S. Const. amend. II. And yet rights of

"the People" are not necessarily enjoyed by all people at all times. Like

all rights, the right to arms has a particular scope; some of the People,

often due to their conduct, will stand outside of it.

Legislatures may disarm individuals for reasons and along grounds

that would have been familiar to the Framers. But no iron rule holds

that anything that legislatures might enact must automatically be

constitutional under any and all circumstances—especially when those

provisions, such as Section 922(g)(1), date from a time when legislatures

lacked judicial guidance as to the Second Amendment's requirements.

Precedent is no longer silent as to who amongst the People has the

right to arms. The Supreme Court began its Second Amendment analysis

"with the strong presumption that the Second Amendment right is

exercised individually and belongs to all Americans." *Heller*, 554 U.S. at

6

581. The Court did not define the provision's full contour, but it held that "law-abiding, responsible citizens" enjoy Second Amendment rights. *Id.* at 635.

The D.C. Circuit recently expounded upon the principle in striking down an ordinance that reserved the right to carry guns to a tiny fraction of "the People." "[T]he right to carry is a right held by responsible, law-abiding citizens for self-defense . . . 'responsible' must include those who are no more dangerous with a gun than law-abiding citizens generally are." *Wrenn* v. *District of Columbia*, 864 F.3d 650, 664 (D.C. Cir. 2017) (citation omitted). "At a minimum, then, the Second Amendment must enable armed self-defense by commonly situated citizens: those who possess common levels of need and pose only common levels of risk." *Id.* "[T]he point of the Amendment [is] that guns would be available to each responsible citizen as a rule (i.e., at least to those no more prone to misuse that access than anyone else)." *Id.* at 665-66.

In guiding dictum, the Supreme Court presumed "longstanding prohibitions on the possession of firearms by felons" to be valid because such laws might reflect the right's "scope" as would be revealed by

7

"historical analysis." *Heller*, 554 U.S. at 626-27 & n.26. "[F]uture legislatures" could not override "the scope [rights] were understood to have when the people adopted them." *Id.* at 634.

"The Founding generation had no laws . . . denying the right [to keep and bear arms] to people convicted of crimes." Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009)). "Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding." *Id.* Yet *Heller*'s description of felon disarmament laws as "longstanding," in the sense that they comport with the Framers' understanding of the right's scope, may nonetheless be harmonized with the historical absence of such laws before the twentieth century. "[W]e look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012) ("*NRA*").

Thus, laws newly enacted in 1968 do not require a specific Framing Era analogue, just as ancient regulatory outliers do not override constitutional text owing to the fortuity that they evaded judicial review.

But the analysis must be grounded in Framing Era thinking. "1791, the year the Second Amendment was ratified—[is] the critical year for determining the amendment's historical meaning." *Moore*, 702 F.3d at 935 (citation omitted).

The analysis comes full circle when considering that Section 922(g)(1) was enacted to "keep firearms out of the hands of presumptively 'risky people.'" *United States* v. *Bass*, 404 U.S. 336, 345 (1971). "The broad objective of § 922(g)—suppressing armed violence—is without doubt an important one." *United States* v. *Yancey*, 621 F.3d 681, 684 (7th Cir. 2010) (citations omitted). The Framers may not have had felon disarmament laws, but they were well-acquainted with the concept of disarming "risky people" to "suppress armed violence."

> [A]ctual "longstanding" precedent in America and pre-Founding England suggests that a firearms disability can be consistent with the Second Amendment to the extent that . . . its basis credibly indicates a present danger that one will misuse arms against others and the disability redresses that danger.

C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 698 (2009).

"The most germane evidence available directly supports the conclusion that the founding generation did not understand the right to keep and bear arms to extend to certain categories of people deemed too dangerous to possess firearms." *Binderup* v. *Atty. General*, 836 F.3d 336, 367 (3d Cir. 2016) (en banc) (Hardiman, J., concurring). Consider the evidence from the Pennsylvania, Massachusetts, and New Hampshire ratifying conventions that the Supreme Court described as "highly influential." *Heller*, 554 U.S. at 604.

Pennsylvania's convention saw a proposal that "no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals." The Address and Reasons of Dissent of the Minority of the Convention of Pennsylvania to their Constituents, *reprinted in* Bernard Schwartz, 2 *The Bill of Rights: A Documentary History* 662, 665 (1971). At the Massachusetts ratifying convention, Samuel Adams proposed that the "Constitution be never construed to authorize Congress . . . to prevent the people of the United States, who are peaceable citizens, from keeping their own arms." Journal of Convention: Wednesday February 6, 1788,

10

*reprinted in Debates and Proceedings in the Convention of the Commonwealth of Massachusetts Held in the Year 1788*, at 86 (Boston, William White 1856). And New Hampshire's convention proposed that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion." Schwartz, supra at 761; see also *NRA*, 700 F.3d at 200 (recounting Revolutionary Era disarmament of Loyalists as a safety measure).

> In sum, the historical record leads [to the conclusion] that the public understanding of the scope of the Second Amendment was tethered to the principle that the Constitution permitted the dispossession of persons who demonstrated that they would present a danger to the public if armed.

*Binderup*, 836 F.3d at 369 (Hardiman, J., concurring) (footnote omitted). "Responsible" people "who are no more dangerous with a gun than law-abiding citizens generally are," who "pose only common levels of risk" and who are "no more prone to misuse [arms] access than anyone else," have Second Amendment rights, *Wrenn*, 864 F.3d at 664-66, as contrasted with those whose possession of arms would threaten society.

Some crimes might indicate a propensity for dangerousness that has no bearing on dangerousness *with guns*.

> [A] prior crime's relevance to the possibility of future danger with a
> gun—crimes involving intentional or purposeful conduct (as in
> burglary and arson) are different from DUI, a strict-liability crime. In
> both instances, the offender's prior crimes reveal a degree of
> callousness toward risk, but in the former instance they also show an
> increased likelihood that the offender is the kind of person who might
> deliberately point the gun and pull the trigger.

*Begay* v. *United States*, 553 U.S. 137, 146 (2008), *overruled on other
grounds*, *Sessions* v. *Dimaya*, 138 S. Ct. 1204 (2018). Courts have thus
been open to affording as-applied relief from Section 922(g)(1) when the
underlying offense, although plainly dangerous, did not signal a firearms
hazard. *See Holloway* v. *Sessions*, No. 1:17-CV-81, 2018 U.S. Dist.
LEXIS 168996 (M.D. Pa. Sept. 28, 2018) (enjoining Section 922(g)(1) on
account of multiple DUIs); *Baginski* v. *Lynch*, 229 F. Supp. 3d 48, 57
(D.D.C. 2017) (denying motion to dismiss Second Amendment challenge
to Section 922(g)(1)'s application to DUI).

## II.     "VIRTUOUSNESS" IS NOT A SECOND AMENDMENT STANDARD.

An alternative view, advanced by three of the eight judges in the
*Binderup* majority, holds that the traditional standard for disarmament
is not dangerousness per se but lack of virtue. *Binderup*, 836 F.3d at 348-
49 (Ambro, J.). Under this approach, the two concepts are not

12

synonymous. Violent criminals "undoubtedly qualify as 'unvirtuous citizens,'" but "[t]he category of 'unvirtuous citizens' is . . . broader than violent criminals; it covers any person who has committed a serious criminal offense, violent or non-violent." *Id.* at 348. A multifactor balancing test is then offered to delineate serious from non-serious crimes. *Id.* at 351-52. "[T]here are no fixed criteria for determining whether crimes are serious enough to destroy Second Amendment rights," and "the category of serious crimes changes over time as legislative judgments regarding virtue evolve." *Id.* at 351.

This approach is rooted in the assertion, made by this Court among others and acknowledged below, that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *Yancey*, 621 F.3d at 684-85. Yet in *Yancey*, this Court treated lack of virtue as synonymous with dangerousness, following its virtuousness observation with "[a]s we've explained . . . most felons are nonviolent, but someone with a felony conviction on his

13

record is more likely than a nonfelon to engage in illegal and violent gun use." *Id.* at 685 (citation omitted).

The notion that "virtuousness" divorced from dangerousness can justify disarmament lacks merit. At the heart of the alleged scholarly support for Defendant's "virtuousness" argument lie three law review articles: Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461 (1995); Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143 (Winter 1986); and Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657 (2002). But these articles do not sustain the "virtuousness" theory.

Reynolds's treatment of the issue in his *Critical Guide* footnotes two sources for his claims on virtuousness and disarmament: the Kates *Dialogue* article at the same page cited by Defendant, and Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 215-16 (1983). *See* 62 Tenn. L. Rev. at 480 n.86 & n.87.

Kates's *Dialogue* contains the familiar language borrowed by Reynolds, for which it provides a citation to Kates's *Handgun Prohibition* article, at 266 as "(citing formulations in which the Founders explicitly limited the right to law-abiding citizens)." 49 Law & Contemp. Probs. at 146 n.19. This description does not mention "virtuousness," and indeed, turning to the *Handgun Prohibition* article, at 266, one finds a claim only that felons were outside the common law because they typically faced dispossession and death. Kates notes that "[w]e may presume that persons confined in gaols awaiting trial on criminal charges were also debarred from the possession of arms," and that "[a]ll the ratifying convention proposals which most explicitly detailed the recommended right-to-arms amendment excluded criminals and the violent." 82 Mich. L. Rev. at 266.

To support his proposition, Kates refers the reader to "notes 70, 72 & 83 supra and accompanying text." *Id.* at 266 n.267. These notes merely cite the right to arms proposals made in the New Hampshire, Pennsylvania, and Massachusetts conventions, which excluded non-peaceable and dangerous citizens from the right. Turning to pages 215-

15

16 of the same article, cited earlier by Reynolds, one finds only a discussion of the militia system.

That leaves the Court with the citation to Cornell's ironically titled "Don't Know Much About History" article. Cornell, arguably the leading champion of the "collective rights" theory repeatedly rejected by the Supreme Court, states that the "right [to arms] was not something that all persons could claim, but was limited to those members of the polity who were deemed capable of exercising it in a virtuous manner." 29 N. Ky. L. Rev. at 679 & n.201. The given footnote leads to another footnote, directing the reader to a "discussion" on the next page that not discuss the "virtuousness" theory.

In any event, whether "most" scholars believe the Framers were motivated to disarm people by considerations of "virtue" is beside the point. There is zero evidence that the Framers did so. *See Binderup*, 836 F.3d at 371-72 (Hardiman, J., concurring). Modern theories of "virtuousness" are no substitute for the copious *evidence* that dangerousness has always been the touchstone for disarmament. And perhaps more importantly for this appeal's purposes, circuit precedent

has upheld Section 922(g)(1) on a dangerousness rationale. Because felons, as a class, are viewed as posing a greater potential danger to society, their near-categorical disarmament is taken to be presumptively lawful. *Yancey*, 621 F.3d at 685. Of course, Section 922(g)(1) does not extend to all felons, excluding the unvirtuous people convicted of "any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices." 18 U.S.C. § 921(a)(20)(A).

Aside from its lack of historical pedigree, "virtuousness" is also not a useful judicial standard for determining who retains a fundamental right. It is perhaps axiomatic that *any* criminal activity suggests a lack of virtue. Strong arguments can be made that many low-level crimes reflect a lack of virtue or even hostility to basic social norms. Indeed, many non-criminal yet rude, selfish or disruptive actions may undermine a person's status as a "virtuous citizen," but should not cost one a fundamental right needed for self-defense.

Indeed, if any right should be withdrawn for lack of virtue, it should be the right to marry. "[M]arriage is a keystone of our social order,"

*Obergefell* v. *Hodges*, 135 S. Ct. 2584, 2601 (2015), and the right to have one's marriage recognized by the state plainly has a civic dimension, *id.* at 2601-02. Yet even prison inmates cannot be denied the right to marry as "an exaggerated response to [prisons'] rehabilitation and security concerns." *Turner* v. *Safley*, 482 U.S. 78, 91 (1987). What are Defendant's concerns here? If they are rooted in public safety, Hatfield should be allowed to demonstrate that these concerns are exaggerated.

III.  FELON DISARMAMENT LAWS ARE SUBJECT TO INDIVIDUALIZED AS-APPLIED CHALLENGES.

While "[a]ll of the circuits to face the issue post *Heller* have rejected blanket challenges to felon in possession laws," *United States* v. *Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011) (footnote omitted), not all felons are dangerous—and some challenges have fared better.

Defendant argued against this as-applied challenge by pointing to the statutes' facial validity. But facial validity is irrelevant. "In upholding [a statute] against a facial challenge, we [do] not purport to resolve future as-applied challenges." *Wis. Right to Life, Inc.* v. *FEC*, 546 U.S. 410, 411-12 (2006) (per curiam).

18

> A facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case. An as-applied attack, in contrast, does not contend that a law is unconstitutional as written but that its application to a *particular person* under *particular circumstances* deprived *that person* of a constitutional right.

*United States* v. *Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) (citations omitted) (emphases added). As-applied challenges do not threaten facial validity, which requires only a "plainly legitimate sweep." *Wash. State Grange* v. *Wash. State Republican Party*, 552 U.S. 442, 450 (2008). A familiar feature of constitutional adjudication, as-applied challenges are especially necessary in the context of categorical disarmament laws.

A.   Legislatures Cannot Define the Scope of a Constitutional Right.

Section 922(g)(1) is not triggered by a finding of dangerousness. Unlike some state disarmament provisions, *e.g.*, 18 Pa. C.S. § 6105(b); N.J. Stat. Ann. § 2C:39-7, it is not even triggered by a conviction for an enumerated crime or type of crime. Rather, Section 922(g)(1) applies on the basis of an offense's potential sentencing range.

But "[a] crime's maximum possible punishment is 'purely a matter of legislative prerogative,'" *Binderup*, 836 F.3d at 351 (quoting *Rummel* v. *Estelle*, 445 U.S. 263, 274 (1980)), "subject only to 'constitutional

19

prohibitions on irrational laws,'" *id.* (quoting *Heller*, 554 U.S. at 628 n.27) (other citation omitted). If this sort of legislative determination sufficed to place people outside the Second Amendment's scope, wholesale permanent denial of the right to arms would effectively be subject to rational-basis review. *Id.* And while "felony" may have a commonly-understood meaning, legislatures are free to define the term and classify crimes as they wish. Notably, Section 922(g)(1)'s colloquially-understood "felon in possession" ban applies to many misdemeanants.

In defining a fundamental right's scope, courts cannot blindly defer to legislative classifications. Both *Binderup* majority authors used the phrase "puts the rabbit in the hat" to dismiss the notion that sentencing classifications, without more, remove individuals from the right's scope. *Binderup*, 836 F.3d at 350 (Ambro, J.); *id.* at 365 n.11 (Hardiman, J., concurring). "Why not" exclude people from the Second Amendment's scope for "all misdemeanors?" *United States* v. *Chovan*, 735 F.3d 1127, 1148 (9th Cir. 2013) (Bea, J., concurring).

> Why not minor infractions? Could Congress find someone once cited
> for disorderly conduct to be "not law-abiding" and therefore to have

20

forfeited his core Second Amendment right? . . . . Why should we not
accept every congressional determination for who is or is not
"law-abiding" and "responsible" for Second Amendment purposes?

*Chovan*, 735 F.3d at 1148 (Bea, J., concurring).

"Why not? Because *Heller* was a constitutional decision. It recognized
the scope of a passage of the Constitution. The boundaries of this right
are defined by the Constitution. They are not defined by Congress." *Id*.
"When the Second Amendment applies, its core guarantee cannot be
withdrawn by the legislature or balanced away by the courts." *Binderup*,
836 F.3d at 365 (Hardiman, J., concurring) (footnote omitted).

B.  This Court Follows the Majority Rule Allowing Individualized
As-Applied Challenges to Felon Disarmament Laws.

"*Heller* referred to felon disarmament bans only as 'presumptively
lawful,' which, by implication, means that there must exist the
possibility that the ban could be unconstitutional in the face of an
as-applied challenge." *United States* v. *Williams*, 616 F.3d 685, 692 (7th
Cir. 2010).

Most circuits that have considered the issue share this view. "Unless
flagged as irrebutable, presumptions are rebuttable." *Binderup*, 836 F.3d
at 350 (citations omitted). "A presumption of constitutionality 'is a

presumption . . . [about] the existence of factual conditions supporting the legislation. As such it is a *rebuttable* presumption.'" *Id.* at 361 n.6 (Hardiman, J., concurring) (quoting *Borden's Farm Products Co.* v. *Baldwin*, 293 U.S. 194, 209 (1934)).

> [W]e doubt the Supreme Court couched its first definitive characterization of the nature of the Second Amendment right so as to completely immunize this statute from any constitutional challenge whatsoever. Put simply, we take the Supreme Court at its word that felon dispossession is *presumptively* lawful.

*Id.* (internal quotation marks omitted).

The First Circuit agrees. "[T]he Supreme Court may be open to claims that some felonies do not indicate potential violence and cannot be the basis for applying a categorical [firearms] ban," or, phrased differently, "the Supreme Court might find some felonies so tame and technical as to be insufficient to justify [a firearms] ban." *Torres-Rosario*, 658 F.3d at 113. The Eighth Circuit rejected an as-applied challenge to Section 922(g)(1) where the felon "has not shown that he is 'no more dangerous than a typical law-abiding citizen." *United States* v. *Woolsey*, 759 F.3d 905, 909 (8th Cir. 2014) (internal quotation marks omitted).

No individualized criteria were at issue in *United States* v. *Phillips*, 827 F.3d 1171 (9th Cir. 2016), which rejected a categorical challenge to basing Section 922(g)(1)'s disability upon a traditional if nonviolent felony. But the Ninth Circuit noted that it remains open to "the question of whether there are limits on Congress's and the States' ability to define any old crime as a felony and thereby use it as the basis for a § 922(g)(1) conviction, consistent with the Second Amendment." *Phillips*, 827 F.3d at 1176 n.5. "Can a conviction for stealing a lollipop . . . serve as a basis under § 922(g)(1) to ban a person for the rest of his life from ever possessing a firearm, consistent with the Second Amendment? That remains to be seen." *Id*.

The Ninth Circuit subsequently noted the potential for individualized as-applied relief. In *Fortson* v. *L.A. City Attorney's Office*, 852 F.3d 1190 (9th Cir. 2017), it denied an as-applied challenge to Section 922(g)(9)'s domestic violence prohibition because the challenger complained only about an alleged lack of notice from the sentencing court as to the prohibition. "Fortson alleged no other facts about himself and his background that would distinguish him from any other domestic violence

misdemeanant, and thus his as-applied challenge fails." *Id.* at 1194. The Ninth Circuit then cited *Binderup* for the proposition "that a plaintiff must allege facts that distinguish him from the typical person the ban applies to in order to state an as applied claim." *Id.* (citation omitted).

The D.C. Circuit offered that absent the prospect of administrative relief,

> the federal firearms ban will remain vulnerable to a properly raised as-applied constitutional challenge brought by an individual who, despite a prior conviction, has become a law-abiding, responsible citizen entitled to use arms in defense of hearth and home.

*Schrader*, 704 F.3d at 992 (internal quotation marks and punctuation omitted).

Two circuits have departed from the trend. "We have already rejected the notion that *Heller* mandates an individualized inquiry concerning felons pursuant to § 922(g)(1)." *In re United States*, 578 F.3d 1195, 1200 (10th Cir. 2009) (citing *United States* v. *McCane*, 573 F.3d 1037 (10th Cir. 2009)) (unpublished order but attached to published dissent). The Fourth Circuit, which had repeatedly acknowledged the prospect of as-applied relief from felon dispossession laws, recently backtracked. "Operating under this presumption of lawfulness, we have recognized

the possibility that an as-applied challenge to a felon disarmament law could succeed in rebutting the presumption." *Hamilton* v. *Pallozzi*, 848 F.3d 614, 622-23 (4th Cir. 2017) (citation omitted). But that court now "hold[s] that a challenger convicted of a state law felony generally cannot satisfy step one" of the Second Amendment inquiry, *id.* at 625, unless "the felony conviction is pardoned or the law defining the crime of conviction is found unconstitutional or otherwise unlawful," *id.* at 626. *Hamilton* did note, however, that misdemeanants swept within "felon disarmament laws" may yet obtain as-applied relief. *Id.* n.11.

Defendant and his amicus overstate the courts' willingness to let Congress define the scope of Second Amendment rights, often by citing to cases rejecting *facial* or particular categorical challenges—not other categorical or, as Hatfield and other successful challengers have asserted, individualized challenges. In *United States* v. *Carter*, 752 F.3d 8 (1st Cir. 2014), the First Circuit "considered only whether the challenger belongs to a class—*e.g.*, 'domestic violence misdemeanants,'" Everytown Br. at 9, because Carter challenged *only* the domestic violence prohibition. *Carter*, 752 F.3d at 10, 12.

In *United States* v. *Bogle*, 717 F.3d 281 (2d Cir. 2013), the Second Circuit considered, and rejected, only a facial challenge to Section 922(g)(1). In *United States* v. *Scroggins*, 599 F.3d 433 (5th Cir. 2010), the felon did not raise a constitutional argument at trial. On plain error review, the Fifth Circuit rejected his claim that Section 922(g)(1) could only be constitutional if he had a violent intent in possessing the gun.

The Ninth Circuit's statement that "felons are categorically different from the individuals who have a fundamental right to bear arms," *United States* v. *Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010), does not address as-applied relief. *See also Phillips*, 827 F.3d at 1176 n.5; *Fortson*, 852 F.3d at 1194. And in *United States* v. *Rozier*, 598 F.3d 768 (11th Cir. 2010) (per curiam), the only "as-applied" claim rejected was based on the felon's motive to possess a gun (home defense), not his personal circumstances.

This Court, and others following the majority rule, have the better of the argument. In any event, the District Court was bound by *Williams* (if not by *Heller*) to conduct an actual as-applied analysis.

IV.   LARRY HATFIELD IS ENTITLED TO ONE-STEP RELIEF BECAUSE HE IS
      A LAW-ABIDING, RESPONSIBLE CITIZEN POSING NO HEIGHTENED
      RISK OF GUN VIOLENCE.

The District Court erred in excusing Defendant from "hav[ing] to focus on Hatfield's specific circumstances." App. A13. "[W]hen combating [sic] as-applied challenges, the Court focuses 'on the relation [the statute] bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case.'" *Id.* (quoting *Ward* v. *Rock Against Racism*, 491 U.S. 781, 801 (1989) and citing *United States* v. *Edge Broad. Co.*, 509 U.S. 418, 431 (1993)).

First, courts should adjudicate, not "combat" constitutional challenges. And *Ward* was not an as-applied case. Rather, it upheld a time, place and manner regulation as against a facial challenge. *See Ward*, 491 U.S. at 788 ("respondent amended its complaint to seek damages and a declaratory judgment striking down the guidelines as facially invalid"); *id.* at 790 ("because the ordinance is valid on its face, we now reverse"). The lower court also overread *Edge*, which is limited to the commercial speech doctrine. *See Lavey* v. *City of Two Rivers*, 171

F.3d 1110, 1115 n.18 (7th Cir. 1999); *Edge*, 509 U.S. at 431. Defendant insists upon the error here, asserting that "as a general matter, if a restriction satisfies the appropriate standard of means-ends scrutiny, an individual plaintiff cannot succeed in an as-applied challenge to the application of the restriction to his unique set of circumstances." Appellant's Br. 22 (citing *Edge Broad.*, 509 U.S. at 430; *Board of Trs. of State Univ. of N.Y.* v. *Fox*, 492 U.S. 469, 480 (1989)). But *Fox*, like *Edge*, was a commercial speech case. Individualized, as-applied challenges remain well-known in constitutional law. *See*, *e.g.*, *HH-Indianapolis, LLC* v. *Consol. City of Indianapolis*, 889 F.3d 432, 439 (7th Cir. 2018); *Marcavage*, 609 F.3d at 273.

Hatfield would have offered a compelling case even had he framed his as-applied challenge in categorical terms, arguing only that convictions for making false statements do not suggest a propensity for gun violence. But Hatfield's claim is stronger, as it is narrowly based on his personal circumstances, among which the predicate crime's nature is just one factor. Hatfield demonstrated that he has always been a peaceful and productive family man and member of the community. Nothing about

Hatfield's record or personal history suggests that he is "more dangerous with a gun than law-abiding citizens generally are," "poses [more than a] common level[] of risk" when possessing firearms, or is "more prone to misuse" firearms than anyone else. *Wrenn*, 864 F.3d at 664, 666.

The District Court also erred in forcing the "round peg" of Hatfield's as-applied challenge into the "square hole" of the familiar, but not mandatory, two-step Second Amendment process. The two-step process does not answer all Second Amendment questions. Neither the D.C. Circuit nor the Supreme Court in *Heller* employed means-ends scrutiny to test Washington, D.C.'s challenged gun prohibitions, striking them down simply upon finding that the laws were inconsistent with the rights guaranteed by the amendment. As useful as means-ends scrutiny may often be, courts would not apply it to laws establishing a state religion or mandating torture as a criminal punishment. The Second Amendment is no different.

"A statute which, under the pretense of regulating, amounts to a destruction of the right . . . would be clearly unconstitutional." *Heller*, 554 U.S. at 629 (internal quotation marks omitted). Where rights are

effectively destroyed, nothing remains for balancing. "It's appropriate to strike down such 'total ban[s]' without bothering to apply tiers of scrutiny because no such analysis could ever sanction obliterations of an enumerated constitutional right." *Wrenn*, 864 F.3d at 665 (citation omitted).

This Court agrees. In adopting the two-step method, *Ezell I* distinguished "broadly prohibitory laws restricting the core Second Amendment right" which are "categorically unconstitutional," from those questioned in "all other cases" calling for means-ends scrutiny. *Ezell I*, 651 F.3d at 703 (citations omitted). "[R]esolving Second Amendment cases *usually* entails two inquiries." *Ezell II*, 846 F.3d at 892 (emphasis added). But not always.

As Judge Hardiman explained for five of eight judges in the *Binderup* majority, individualized as-applied challenges fall into the first category. "It is true that courts typically apply some form of means-end scrutiny to as-applied challenges once it has been determined that the law in question burdens protected conduct." *Binderup*, 836 F.3d at 363 (Hardiman, J., concurring).

But when . . . it comes to an as-applied challenge to a presumptively lawful regulation that *entirely bars* the challenger from exercising the core Second Amendment right, any resort to means-end scrutiny is inappropriate once it has been determined that the challenger's circumstances distinguish him from the historical justifications supporting the regulation. This is because such laws are categorically invalid as applied to persons entitled to Second Amendment protection—a matter of scope.

*Id.*; *see also Britt* v. *State*, 363 N.C. 546, 681 S.E.2d 320 (N.C. 2009).

The laws challenged here do not regulate Hatfield's possession or use of firearms; they completely prohibit him from even possessing guns. If Hatfield can prove that he belongs among "the 'law-abiding, responsible citizens' whose Second Amendment rights are entitled to full solicitude under *Heller*," *Ezell I*, 651 F.3d at 708, if he can establish that "despite [his] prior conviction, [he] has become a law-abiding, responsible citizen entitled to use arms in defense of hearth and home," *Schrader*, 704 F.3d at 992 (internal quotation marks and punctuation omitted), there is no interest in disarming him. This type of case involves no second step. It ends when the challenger is deemed dangerous, or not, based on a holistic assessment of the challenger's circumstances.[3]

---

[3] *Williams* utilized intermediate scrutiny to test an as-applied challenge to Section 922(g)(1) "without determining that it would be the precise test  applicable to all challenges to gun restrictions." 616 F.3d at

One of the decisions affirmed in *Binderup* sought to employ the two-step framework in the individualized as-applied context, and in so doing, explained the problem neatly.

> [I]f a challenger [demonstrates] that he is outside the scope of § 922(g)(1), and thereby shows he is a law-abiding citizen who falls within the core of the Second Amendment's protection, any means-end scrutiny would be fatal in fact . . . . [a]s a practical matter, therefore, an analysis of the second prong . . . is futile. Accordingly, we find that in the context of an as-applied Second Amendment challenge to § 922(g)(1), the analysis begins and ends with [one-step precedent].

*Suarez* v. *Holder*, 255 F. Supp. 3d 573, 583 (M.D. Pa. 2015) (footnote and citations omitted), *aff'd sub nom Binderup*, supra.

Of course, Hatfield would also prevail under an intermediate scrutiny analysis, because there is no evidence tying him, specifically, to dangerousness. What others who committed the same or similar offense may or may not do is irrelevant. The focus here is on Larry Hatfield. If a forgerer cannot obtain individualized as-applied relief because some study asserts that forgerers might murder people in the future, there is

---

692. The government prevailed "by pointing to Williams's own violent past." *Id.* at 693.

no point pretending that as-applied relief exists only to be invariably

defeated under some level of "scrutiny."

## V.  WHILE POLICY CONSIDERATIONS CANNOT OVERRIDE FUNDAMENTAL RIGHTS, FAILURE TO ACKNOWLEDGE INDIVIDUALIZED RELIEF FROM FELON DISARMAMENT LAWS WOULD HAVE ABSURD AND DANGEROUS RESULTS.

The federal government often complains that individualized

assessments are too burdensome to litigate, and that its efforts to

administer the individualized disarmament relief provisions of the now-

defunded Section 925(c) yielded poor results.

The arguments are unavailing. If the government has the time and

resources to operate a breathtakingly-broad law like Section 922(g)(1), it

should find a way to ensure that individuals posing no threat to public

safety do not have their fundamental rights swept away. As the D.C.

Circuit warned Congress, this type of litigation should be expected so

long as Section 925(c) remains unfunded. *Schrader*, 704 F.3d at 992.

And any defects in the Section 925(c) process are beside the point. As

Judge Hardiman pointed out,

> a constitutional inquiry into a presumptively lawful statute is distinct from the one- sided, fact-intensive inquiry that would have been called for were courts required to assess § 925(c) petitions in the first

instance. Reviewing an as-applied constitutional challenge based on
facts alleged by a challenger and weighing those facts against
competing evidence proffered by the Government is not only
something courts are equipped to do, it is our constitutional duty.

*Binderup*, 836 F.3d at 366 n.13 (Hardiman, J., concurring) (citations
omitted).

Every day in America, people verify and disprove all manner of

personal information about each other in a wide array of legal disputes.

The federal government is very good at conducting background checks,

pre-sentence reports, and civil discovery. And jurisdiction over

constitutional claims is not optional. "The judiciary cannot, as the

legislature may, avoid a measure because it approaches the confines of

the constitution. We cannot pass it by because it is doubtful." *Cohens* v.

*Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821).

The day where the government might permanently deprive

individuals of all Second Amendment rights on account of relatively

trivial offenses has arrived. In Massachusetts, shoplifting goods valued at

$100, or the second offense of selling pigs without a license, are both

misdemeanors punishable by two-and-a-half years imprisonment and

thus trigger Section 922(g)(1). *See* Mass. Gen. Law c. 266, § 30A; *id.* c.

129, §§ 39, 43. The preceding three Presidents would have been permanently disarmed had they possessed their marijuana in Arizona. *Binderup*, 836 F.3d at 372 n.20 (Hardiman, J., concurring) (citation omitted). Anyone redeeming out-of-state bottle deposits in Michigan, such as *Seinfeld*'s Newman and Kramer, or stealing $150 from a Pennsylvania library, faces federal disarmament. *Id.* (citations omitted).

Prosecutorial overreach further poses concerns. For example, while Florida punishes the release of balloons as a noncriminal infraction subject to a $250 fine, Fla. Stat. § 379.233, one Florida man faced a third-degree felony charge, punishable by five years imprisonment, for releasing a dozen heart-shaped balloons as a gesture to his girlfriend.[4] Should that transgression have cost him his Second Amendment rights

---

[4]*See* Erika Pesantes, *Love hurts: Man arrested for releasing helium balloon with his girlfriend*, Sun Sentinel, February 22, 2013, available at http://articles.sun-sentinel.com/2013-02-22/news/fl-helium-balloon-environmental-crime-20130222_1_helium-balloon-fhp-trooper-wood-stor ks (last visited Oct. 9, 2018). The gentleman was initially charged under the general felony pollution statute, Fla. Stat. § 403.161(1)(a), albeit coded as "Haul Waste Tire w/out a Permit." *See State of Florida* v. *Anthony Cade Brasfield*, Broward County (Fl.) Case No. 13002444CF10A (filed Feb. 18, 2013).

forever? An Ohio woman faces the same prospect because someone left four too-many used tires in her pickup truck—a felony.[5]

Such deprivations of Second Amendment rights are not without consequence—for the individuals who lose their rights, and for society. The Second Amendment reflects the policy judgment that there is value in affording individuals the means of defending themselves. Needlessly disarming law-abiding, responsible citizens thus carries a cost. Consider the case of Thomas Yoxall, convicted of felony theft in 2000, who three years later successfully asked that his conviction be reduced to a misdemeanor so that he might regain his firearm rights. Last year, Yoxall used his gun to save an Arizona trooper who had been shot and was being beaten to death on the side of a highway.[6] The harm some may

---

[5] *Ohio woman faces $10K fine, 4 years' prison for 4 extra tires*, Atlanta Journal-Constitution, Sept. 27, 2018, available at https://www.ajc.com/news/national/ohio-woman-faces-10k-fine-years-pris on-for-extra-tires/OU6DRSZvzAYgO9tPjWZK2J/ (last visited Oct. 9, 2018).

[6] *See* Megan Cassidy, *A visceral reaction with no time to spare: Arizona man gives emotional account of saving DPS trooper*, Arizona Republic, Jan. 24, 2017, available at http://www.azcentral.com/story/ news/local/southwest-valley/ 2017/01/24/phoenix-man-gives-emotional-recount-taking-life-save-trooper/97005886/ (last visited Oct. 9, 2018).

pose on account of 18-year-old theft convictions is theoretical. Trooper

Andersson being alive today is real.

## CONCLUSION

The judgment should be affirmed.

Dated:　October 12, 2018　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　Alan Gura
　　　　　　　　　　　　　　　　　　GURA PLLC
　　　　　　　　　　　　　　　　　　916 Prince Street, Suite 107
　　　　　　　　　　　　　　　　　　Alexandria, VA 22314
　　　　　　　　　　　　　　　　　　703.835.9085
　　　　　　　　　　　　　　　　　　alan@gurapllc.com

　　　　　　　　　　　　　　　　　　Counsel for Amicus Curiae

CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Seventh Circuit Rule 29 because this brief contains 6,943 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Corel Wordperfect in 14-point Century Schoolbook font.


/s/ Alan Gura_____
Alan Gura

CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2018, I filed the foregoing with

the Clerk of the Court using the CM/ECF System, which will send notice

of such filing to all registered CM/ECF users.

/s/ Alan Gura
Alan Gura